[No. 42668-4-II. Division Two. January 23, 2013.]

K.P. McNamara Northwest, Inc., et al., *Appellants*, v. The Department of Ecology, *Respondent*.

106

Larisa Rasskazova (of Larisa Rasskazova Law Office) (Thomas Benke, of counsel), for appellants.

Robert W. Ferguson, Attorney General, and Phyllis J. Barney, Assistant, for respondent.

¶1 VAN DEREN, J. — KP McNamara Northwest and Kerry McNamara appeal the Pollution Control Hearings Board's (Board) summary judgment order affirming two Department of Ecology (Department) penalties for violations of the Haz-

ardous Waste Management Act (HWMA), chapter 70.105 RCW. The Department's notice of penalty cited KP McNamara for failing to follow proper procedures under the dangerous waste regulations when it (1) shipped rinse water KP McNamara had designated as dangerous waste off-site and (2) received and managed "non-empty" containers without a permit. KP McNamara and Kerry McNamara argue that the Board erred when it concluded that (1) KP McNamara's designation of its rinse water as "dangerous" was dispositive of the issue of whether the rinse water it shipped off-site was actually dangerous waste and (2) Kerry McNamara was personally liable for the Department's penalty due to his position as president and chief executive officer (CEO) of KP McNamara.

¶2 The Department cross appeals the superior court's remand to the Board. The Department asserts that the superior court erred when it concluded that the Board committed a procedural error by considering facts about KP McNamara's receipt and management of non-empty containers because the issue before the Board was solely a question of law. KP McNamara and Kerry McNamara also appeal the superior court's denial of their attorney fees request for work related to the remanded issue. We affirm the Board's decision in full, reverse the superior court's remand to the Board, and deny attorney fees to KP McNamara and Kerry McNamara both at the superior court and on appeal.

## FACTS

¶3 KP McNamara operated a facility in Vancouver, Washington,[1] that restored and deconstructed 300-gallon plastic containers called "totes." Clerk's Papers (CP) at 692. Kerry McNamara, the company's owner and president, oversaw and controlled the Vancouver facility. The facility

---

[1] The KP McNamara facility in Vancouver, Washington, is no longer operating. It completed its facility closure certification in October 2009.

received totes from a broad range of manufacturing and service facilities; it then drained them, rinsed them with water, and either refurbished or deconstructed them. Some of the totes contained biocide, paint, resin, or adhesive residue that may have been corrosive, ignitable, toxic, or otherwise extremely hazardous and designated as "dangerous waste" by Washington State dangerous waste regulations, chapter 173-303 WAC.[2] CP at 677.

¶4 Under the HWMA and the regulations implementing it, a facility that treats, stores, or disposes of dangerous waste (a TSD facility) must have a permit issued by the State of Washington. WAC 173-303-280(1), -800(2). A facility that uses containers that are not defined as "empty" under WAC 173-303-160(2)[3] is also subject to the dangerous waste regulations and must have the proper permit. WAC 173-303-160(3)(b). KP McNamara did not possess a permit to operate as a TSD facility. Any person who generates solid waste[4] must determine whether such waste is designated

---

[2] Several of the WAC sections cited in this opinion were amended after 2008, the last date of KP McNamara's alleged noncompliance with the regulations. Most of the amendments have not altered the regulations in any way relevant to this case; accordingly, we cite the current version of those regulations. Where the amendment is a significant change from the regulation in effect when the issues in this matter arose and is relevant to the issues presented, we cite to the former WAC.

[3] The Department amended WAC 173-303-160 in 2009. Wash. St. Reg. 09-14-105 (effective July 31, 2009). Under the former regulations, a container was defined as "empty" if it (1) contained no more than one inch of waste, (2) the volume of waste remaining in the container was equal to three percent or less of the container's total capacity, or (3) the volume of waste remaining in the container was no more than 0.3 percent of the container's total capacity if the container's total capacity was greater than 110 gallons. Former WAC 173-303-160(2)(a) (2000). The current regulations provide that a container is "empty" if it contains (1) no more than one inch of waste, (2) no more than three percent waste by weight if the container is 119 gallons or less in size, or (3) no more than 0.3 percent waste by weight if the container is greater than 119 gallons in size. WAC 173-303-160(2)(a).

[4] "A solid waste is any discarded material that is not excluded by WAC 173-303-017(2) or that is not excluded by variance granted under WAC 173-303-017(5)." WAC 173-303-016(3)(a). A "discarded material" is any material that is (1) abandoned, (2) recycled, (3) considered inherently waste-like, or (4) a military munition identified as a solid waste under WAC 173-303-578. WAC 173-303-016(3)(b). The parties do not raise an issue about whether the waste was "solid," only whether it was "dangerous."

as "dangerous," and must follow the Department's procedures for doing so. WAC 173-303-070(1)(b); *Hickle v. Whitney Farms, Inc.*, 148 Wn.2d 911, 919-20, 64 P.3d 1244 (2003).

¶5 In August 2007, Deann Williams, an inspector for the Department's Hazardous Waste and Toxics Reduction Program, conducted two inspections of the KP McNamara facility. During the inspections, Williams collected a rinse water sample from an accumulation on the floor in a sump of the tote rinse system. The water had a pH of 14, meaning that it was a corrosive, dangerous waste. Williams also noted that there were spills around pipes and totes, that employees at the facility did not seem to have an understanding of the proper handling or shipment of dangerous waste, and that there was no schedule for regular inspection of the facility.

¶6 Williams also noted containers without proper content labels and totes that did not meet the definition of "empty" under former WAC 173-303-160(2) (2000). CP at 678. She observed non-empty totes sitting outside the KP McNamara building, some of which did not have lids and were "off-gassing to the air" and were "leaking and draining to the tote below or to the gravel." CP at 796. Based on her findings, Williams issued an immediate action letter to KP McNamara informing it of the steps that it had to take to bring the facility into compliance with the dangerous waste regulations.

¶7 On September 11, 2007, Williams met with Kerry McNamara and representatives of KP McNamara's environmental service contract providers at the Vancouver facility. During the meeting, Williams noted that there were totes on site that had been there since August and that were still not properly labeled.

¶8 Addressing the results of Williams's testing from her previous inspections, Kerry McNamara explained that one of his employees confused the soap and caustic systems and that the employee must have dumped the caustic solution

on the floor. He explained that the Vancouver facility used a "caustic wash" system that had a pH of 13 or 14. CP at 696. The waste from the system was supposed to be routed back to a holding tank and was to be reused until it was too dirty, and then it was to be managed off-site as a dangerous waste. Kerry McNamara stated that he did not plan to use the caustic solution on site in the future.

¶9 At that visit, Williams noted four totes labeled "hazardous waste, caustic" at the facility. CP at 698. Kerry McNamara stated that the totes contained soap solution drained out of the waste system but that the soap solution was likely mixed with caustic solution due to his employee's confusion of the systems. He proposed to manage the four totes off-site as corrosive dangerous waste.

¶10 To satisfy the Department's concerns that the waste at KP McNamara's facility could be corrosive or toxic, KP McNamara gave the Department its protocol for determining whether its wash water was a dangerous waste. The protocol provided that each batch of wash water would be individually tested before being shipped off-site, in compliance with the requirements for designation of dangerous waste under WAC 173-303-070(3). In response, the Department submitted a draft policies and practices statement to KP McNamara to confirm how KP McNamara would address compliance issues in the future, including that each batch of waste would be designated before disposal.

¶11 But as a result of KP McNamara's concern about the cost of "batch testing" the rinse water, the Department later agreed that KP McNamara could instead declare the waste to be dangerous using "process knowledge," meaning that it could designate all rinse water as dangerous waste instead of testing each batch individually. CP at 11. Under this understanding, the Department drafted another policies and practices document to ensure KP McNamara's compliance with the regulations that provided, "Given the variability of wastewater [sic] generated by rinsing totes, KP McNamara will designate all waste in the 2500-gallon

water storage tanks as dangerous waste." CP at 585. The document also provided that KP McNamara would not accept totes unless they were "empty" according to the dangerous waste regulations, and if it did receive such non-empty totes, it would ship them back to the generating facility and would not store them at KP McNamara. Kerry McNamara signed the policies and practices document as president of KP McNamara.

¶12 In May 2008, Williams conducted another inspection of the Vancouver facility. Williams discovered that KP McNamara had sent four shipments of waste water to Pacific Power Vac in Portland, Oregon, in violation of WAC 173-303-141(2).[5] In making these shipments, KP McNamara (1) failed to use a certified dangerous waste transporter to haul the waste, (2) failed to complete a uniform hazardous waste manifest for the shipment, and (3) did not have required documentation showing that Pacific Power Vac was authorized to accept the waste. In a May 19 letter, Williams told Kerry McNamara that KP McNamara must cease off-site shipments until it complied with WAC 173-303-141(2). But in June, despite the Department's mandate, KP McNamara sent another shipment of rinse water to Pacific Power Vac.

---

[5] WAC 173-303-141(2) provides:

A person may offer a state only designated dangerous waste (not regulated as a hazardous waste by [the United States Environmental Protection Agency] (EPA)) to a facility [that] is located outside of this state and [that] does not meet the requirements of subsection (1) of this section if:

(a) The facility receiving the waste will legitimately treat or recycle the dangerous waste (disposal is an unacceptable management practice);

(b) The generator has on file a letter or copy of a letter signed by the regulatory authority in the receiving state that the receiving facility may accept the waste;

(c) The generator uses a transporter with a valid EPA/state identification number;

(d) The generator complies with all other applicable requirements, including manifesting, packaging and labeling, with respect to the shipping of the waste. However, the EPA/state identification number for the receiving facility is not required on the manifest or annual report; and

(e) The generator receives from the receiving facility a signed and dated copy of the manifest.

114

¶13 In July, Kerry McNamara sent a letter to Williams with documentation showing that Pacific Power Vac was authorized to accept the shipped waste. He also conceded that KP McNamara had failed to use a hazardous waste manifest for the shipments, stating, "We understand now that a hazardous waste manifest must be used if the wastewater [sic] is designated as . . . [d]angerous." CP at 734. Finally, the letter also stated, "In our effort to correct this error, KP [McNamara] has received authorization to begin using . . . Quality Carriers which is a [Department of Transportation (DOT)]-approved transporter." CP at 734. This statement indicated that a DOT transporter had not been used when KP McNamara shipped the rinse water to Pacific Power Vac.

¶14 In October, Williams conducted two more inspections of the KP McNamara facility. She noted that nearly "100 totes of dangerous waste wash water had accumulated on-site," as well as several totes that did not meet the regulatory definition of "empty." CP at 681. Williams subsequently sent an immediate action letter to Kerry McNamara, notifying him that by accepting non-empty totes, KP McNamara had violated WAC 173-303-950[6] because it acted as a TSD facility without a permit to accept, treat, or dispose of dangerous waste. In response, Kerry McNamara stated in a letter to Williams that the facility would no longer accept totes that did not meet the regulatory definition of "empty." He signed this letter as CEO of KP McNamara.

PROCEDURAL FACTS

¶15 In December 2008, the Department issued an administrative order (no. 6237) and notice of penalty (no. DE 6229) to KP McNamara and Kerry McNamara, assessing a

---

[6] WAC 173-303-950(2) provides, "Any violation of this chapter may be subject to the enforcement and penalty sanctions of chapter 70.105 RCW. Such violations include, but are not limited to . . . (2) [t]ransferring, treating, storing, or disposing of dangerous waste without a permit."

$20,000 fine for violation of chapter 70.105 RCW. The notice of penalty provided:

Th[is] penalty is based on the following Department findings:

**WAC 173-303-141(2): Failure to use appropriate procedures and methods when sending a state-only designated dangerous waste to an out-of-state facility.** KP [McNamara] inappropriately disposed of five shipments of state-only toxic dangerous waste (rinse-water). In each case, the shipment was sent off-site without a dangerous waste manifest. It was hauled by a transporter without [a United States Environmental Protection Agency]/State Transporter Identification Number, and without confirmation that the receiving facility was permitted to accept dangerous waste.

**[WAC] 173-303-280 and -400: Failure to obtain a permit or to comply with the requirements for operating a dangerous waste treatment, storage and disposal TSD facility.** KP [McNamara] accepted totes from off-site generators. These totes were not "empty" as defined in [former] WAC 173-303-160(2), and contained significant amounts of ignitable, extremely hazardous and toxic dangerous waste. KP [McNamara] operated as an unpermitted dangerous waste treatment, storage and disposal facility when it accepted the totes containing dangerous waste.

CP at 265. KP McNamara and Kerry McNamara timely appealed to the Board.

¶16 The parties engaged in a prehearing conference and agreed on seven issues for the Board to consider under WAC 371-08-435. Of those seven issues, four are relevant to this appeal:

1. Is Kerry McNamara a person liable pursuant to the [HWMA] (Chapter 70.105 RCW) for the alleged violation of [KP McNamara]?

. . . .

3. Did [KP McNamara] "inappropriately dispose of" dangerous waste (rinse-water) when the waste was transported to and treated at an appropriate permitted waste water treatment facility?

. . . .

5. Is [KP McNamara] required to obtain a permit or to comply with the requirements for operating a dangerous waste treatment, storage and disposal [TSD] facility if [KP McNamara] receives from off-site generators containers [that] are not "empty" pursuant to [former] WAC 173--30[3]-160 and/or 40 CFR 261.7(b)(1) and [that] contain dangerous waste if the container[s] w[ere] shipped [to KP McNamara] without a hazardous (dangerous) waste manifest and [their] contents were [not[7]] designated a "dangerous waste" by the generator [that shipped them to KP McNamara]?

6. Did [KP] McNamara violate the hazardous waste statute and regulations as alleged in Notice of Penalty No. DE 6229?

CP at 297. Issue 1 pertains to Kerry McNamara's personal liability for the penalty. Issues 3 and 5 pertain to the two substantive grounds for the penalties—issue 3 for violation of WAC 173-303-141(2) and issue 5 for violation of WAC 173-303-280 and WAC 173-303-400. Issue 6 asks the Board to determine whether the violations in the notice of penalty actually occurred.

¶17 The Department moved for summary judgment on issues 1, 3, and 5.[8] On the issue pertaining to Kerry McNamara's personal liability (issue 1), the Board concluded that Kerry McNamara was personally liable for the penalty under the responsible corporate officer doctrine and RCW 70.105.080(1), which provides liability for civil penalties for "every person who fails to comply with any provision of [the HWMA] or of the rules adopted thereunder."

¶18 Regarding KP McNamara's shipment of rinse water to Pacific Power Vac (issue 3), KP McNamara did not

---

[7] The parties agree that the omission of "not" from issue 5 was a typographical error. Br. of Resp't/Cross Appellant at 12 n.4; Br. of Appellants at 11 n.2.

[8] The Department also moved for summary judgment on issue 4, whether the Department had jurisdiction over the KP McNamara facility, but this is not at issue on appeal.

contest the Department's assertion that KP McNamara failed to comply with the regulations pertaining to disposal of dangerous waste. Rather, KP McNamara claimed that the Department failed to prove that the rinse water transported to Pacific Power Vac was considered a dangerous waste under the regulations and, thus, KP McNamara was not subject to the regulations pertaining to the disposal of dangerous waste. The Board rejected KP McNamara's argument and found that KP McNamara's designation of the rinse water as a dangerous waste in its policies and practices document was dispositive on the issue of whether the rinse water transported to Pacific Power Vac was a dangerous waste.

¶19 Finally, on the issue related to KP McNamara's receipt of non-empty totes (issue 5), the Board concluded that because KP McNamara "received, consolidated, and stored" non-empty totes, it was required to obtain permits and to comply with proper disposal regulations. 11 Administrative Record (AR) at 19. Thus, the Board granted the Department's motion on all three issues.

¶20 KP McNamara filed a motion for reconsideration on issues 3 and 5. On issue 5, it argued that the Board improperly affirmed the penalty for receipt of non-empty totes because the Board considered facts pertinent not only to the receipt of the totes but also to their consolidation and storage. Thus, KP McNamara argued, the Board exceeded the narrow question of law presented in issue 5 and, instead, improperly considered KP McNamara's management of the waste on site, an issue not properly before the Board. On reconsideration, the Board found that material facts were in dispute regarding the "nature and extent" of KP McNamara's receipt of the non-empty totes and, thus, reversed its summary judgment ruling on issue 5 and set the matter for hearing. CP at 315-16.

¶21 At the hearing on issue 5, KP McNamara argued that the Board should not consider the "nature and extent" of KP McNamara's receipt of the totes in determining

whether KP McNamara was required to obtain a TSD facility permit. 27 AR at 3 (internal quotation marks omitted). Rather, it argued, the Board was constrained to address only the legal issue and, thus, was required to consider only whether the receipt of non-empty totes required a TSD facility permit because the Department's position had been that receipt of the totes alone violated the dangerous waste regulations. KP McNamara further argued that under the HWMA's manifest discrepancies regulations, it was not required to possess a permit for mere receipt of the totes.

¶22 The Department responded that KP McNamara's reliance on the manifest discrepancies regulations was improper because the regulations applied only to TSD facilities with proper permits. It further argued that even if the manifest discrepancies regulations were applicable, KP McNamara nevertheless failed to comply with the regulations.

¶23 After the hearing, the Board agreed with the Department and concluded:

> Regardless of whether the manifest discrepancy rules are directly applicable to the KP McNamara facility [the manifest discrepancy rules] do not operate to shield KP McNamara from a penalty or from TSD facility permitting or operating requirements under the facts of this case. This is because KP McNamara failed to demonstrate that the manner in which it responded to receipt of the non-empty totes complied with the manifest discrepancy regulations (either the former or current versions).

CP at 291. The Board further concluded that "KP McNamara continued receiving more than an incidental or occasional number of non-RCRA[9] empty totes after being directed by [the Department] to cease doing so [and] failed to follow its own standard operating procedures directing that it would not receive and manage non[-]empty totes."

---

[9] Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901-6992k.

CP at 292. Thus, the Board concluded that "KP McNamara was reasonably subjected to the requirements of WAC 173-303-280(1) and -400" as set forth in the notice of penalty. CP at 292. Accordingly, after the hearing on issue 5, the Board affirmed the Department's order and the $20,000 penalty against KP McNamara and Kerry McNamara. Its findings on issues 1 and 3 were identical to its findings in the original summary judgment order.

¶24 KP McNamara and Kerry McNamara appealed the Board's decision to the superior court, which affirmed the Board's determination of Kerry McNamara's personal liability (issue 1) and the Department's $10,000 penalty for improper disposal of dangerous waste (issue 3). But the superior court concluded that the Board exceeded the scope of the issue in its prehearing order on issue 5, and thus, the superior court found that the Board engaged in an unlawful procedure or decision-making process. Accordingly, the superior court remanded the matter to the Board to determine the narrower legal issue.

¶25 KP McNamara and Kerry McNamara requested attorney fees relating to the remanded issue under RCW 4.84.350(1), which allows the prevailing party in a judicial review of an agency action to recover attorney fees. The superior court reserved ruling on attorney fees pertaining to issue 5 pending the Board's resolution of the issue on remand.

¶26 Without the Board first conducting a remand hearing, KP McNamara and Kerry McNamara appealed the Board's decision on summary judgment that Kerry McNamara was personally liable for the citations and that KP McNamara inappropriately disposed of dangerous waste. They also appeal the superior court's denial of attorney fees on the remanded issue on KP McNamara's receipt of non-empty totes without a permit, which remand the Department appeals.

## ANALYSIS

¶27 KP McNamara and Kerry McNamara assign error to the Board's summary judgment order in favor of the Department. They argue that the Board improperly determined that KP McNamara's designation of its rinse water as dangerous waste was dispositive on whether the rinse water shipped to Pacific Power Vac was dangerous waste, and that the Board improperly applied the responsible corporate officer doctrine and RCW 70.105.080 to impose personal liability on Kerry McNamara for the violations in the notice of penalty. KP McNamara and Kerry McNamara also argue that due to the superior court's remand of issue 5 to the Board, they were the prevailing parties on appeal of administrative action and are entitled to attorney fees under RCW 4.84.350(1).

¶28 The Department appeals the superior court's remand to the Board on issue 5, arguing that the Board did not make a procedural error when it considered facts about KP McNamara's management of non-empty totes in making its determination of whether KP McNamara committed the violations stated in the notice of penalty.

I. STANDARDS OF REVIEW

¶29 The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of the Board's decisions. Former RCW 43.21B.180 (1994); *Skagit Hill Recycling, Inc. v. Skagit County*, 162 Wn. App. 308, 317, 253 P.3d 1135 (2011). We review the Board's action from the same position as the superior court and apply the APA standards directly to the record before the Board. *Skagit Hill Recycling*, 162 Wn. App. at 317-18. Accordingly, "[b]ecause this court sits in the same position as the superior court, we do not give deference to the superior court's rulings." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). KP McNamara bears the

burden of demonstrating the invalidity of the Board's decision. RCW 34.05.570(1)(a).

■ ¶30 "[W]here the original administrative decision was on summary judgment, the reviewing court must overlay the APA standard of review with the summary judgment standard." *Verizon*, 164 Wn.2d at 916. "Summary judgment is appropriate only where the undisputed facts entitle the moving party to judgment as a matter of law." *Verizon*, 164 Wn.2d at 916. We review the facts in the record de novo and in the light most favorable to the nonmoving party. *Verizon*, 164 Wn.2d at 916. And we review the Board's legal conclusions using the APA's "error of law" standard, which allows this court to substitute its view of the law for that of the Board. *Verizon*, 164 Wn.2d at 915; RCW 34.05.570(3)(d).

■■ ¶31 We may also grant relief if the agency engaged in unlawful procedure. RCW 34.05.570(3)(c). "We review procedural errors de novo." *Stevens County v. Loon Lake Prop. Owners Ass'n*, 146 Wn. App. 124, 129, 187 P.3d 846 (2008). "In reviewing an agency action for procedural error, '[t]he court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of.' " *Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 414, 216 P.3d 451 (2009) (alteration in original) (quoting RCW 34.05.570(1)(d)). Thus, on this issue, Kerry McNamara and KP McNamara must show that the Board did not correctly follow its own procedure and that they were substantially prejudiced by any proven irregularity. RCW 34.05.570(1)(d); *Alpha Kappa Lambda Fraternity*, 152 Wn. App. at 414.

II. DESIGNATION OF RINSE WATER AS "DANGEROUS WASTE"

¶32 KP McNamara argues that the Board erred when it determined on summary judgment that KP McNamara improperly disposed of dangerous waste (issue 3). It argues that its designation of the rinse water as dangerous waste in its policies and practices document was not dispositive on

whether the rinse water was actually considered dangerous waste under the dangerous waste regulations.[10] It also argues that it raised a genuine issue of material fact when it submitted a declaration from Kerry McNamara stating that the methods used to wash the totes at the facility made it impossible for the rinse water in question to be dangerous waste and that testing years before the rinse water was shipped demonstrated that the rinse water was not dangerous waste. We disagree.

A. Pertinent Facts

¶33 Williams inspected the KP McNamara facility and discovered totes that contained a mixture of rinse water and a caustic solution that was a corrosive dangerous waste. KP McNamara proposed that the totes be managed off-site as a dangerous waste, and to satisfy the Department's concerns that the contents of the totes were toxic, KP McNamara agreed to "batch test[ ]" all of the rinse water before shipping it off-site. CP at 679. But due to KP McNamara's concern about the high cost of individual batch testing, the Department and KP McNamara agreed that KP McNamara could instead designate all of the rinse water in the totes as a dangerous waste, and Kerry McNamara signed the Department's policies and practices document agreeing to do the same. Williams later discovered that KP McNamara had shipped waste water to Pacific Power Vac and failed to follow the requirements in WAC 173-303--141(2), which include using a certified dangerous waste transporter, completing uniform hazardous waste manifests, and obtaining proper documentation that Pacific Power Vac was authorized to accept the waste.

¶34 The Department cited KP McNamara for "[f]ailure to use appropriate procedures and methods when sending a

---

[10] KP McNamara does not challenge the Board's findings that it failed to comply with the specific requirements for transporting dangerous waste under WAC 173-303-141(2). Accordingly, we address only whether the rinse water shipped to Pacific Power Vac was a "dangerous waste" under the regulations. WAC 173-303-141(2).

state-only designated dangerous waste to an out-of-state facility" in violation of WAC 173-303-141(2). CP at 265 (boldface omitted). The Board's prehearing order pertaining to the violation (issue 3) asked, "Did appellant inappropriately dispose of dangerous waste (rinse-water) when the waste was transported to and treated at an appropriate permitted waste water treatment facility?" CP at 297 (internal quotation marks omitted). The Department moved for summary judgment and argued that once KP McNamara chose to characterize all of the rinse water as dangerous waste, KP McNamara had to comply with the requirements of WAC 173-303-141 and that it failed to do so.

¶35 In response to the Department's summary judgment motion, KP McNamara did not contest its failure to comply with the dangerous waste transport requirements. Rather, it argued that before determining that a violation of WAC 173-303-141 had occurred, the Department was required to affirmatively prove that the rinse water in question was a "dangerous waste," which it failed to do. 7 AR at 6. But the Board concluded that KP McNamara's designation of the rinse water as dangerous waste was dispositive on that issue, and it found that "[t]here is no remaining question of fact as to whether or not the waste product at issue was dangerous waste or not—[KP] McNamara had identified it as such, set up procedures to handle it as such, and cannot now turn back the clock." CP at 513.

B. Statutory and Regulatory Framework: "Designation" of Waste under the HWMA

■ ¶36 To determine whether KP McNamara's designation of the rinse water as dangerous waste was dispositive on whether the rinse water shipped to Pacific Power Vac was a dangerous waste, we must interpret the HWMA. Where statutory construction is necessary, we interpret statutes de novo. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). But "if an

ambiguous statute falls within the agency's expertise, the agency's interpretation of the statute is 'accorded great weight, provided it does not conflict with the statute.' " *Port of Seattle*, 151 Wn.2d at 587 (quoting *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002)).

¶37 Hazardous waste is regulated at the federal level by the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901-6992k, and in Washington by the HWMA and the regulations implementing it, chapter 173--303 WAC. WAC 173-303-070 requires any person who generates solid waste to determine whether their solid waste is designated as dangerous waste, and upon determining that it is, that person is subject to the dangerous waste regulations set forth in chapter 173-303 WAC. *Hickle*, 148 Wn.2d at 919-20.

¶38 The dangerous waste regulations provide a four-step procedure that generators of solid waste must follow to determine if their solid waste is a designated dangerous waste. WAC 173-303-070(3)(a)-(b); *Hickle*, 148 Wn.2d at 920. The "[d]esignation procedures" set forth in WAC 173--303-070(3)(a) provide:

> To determine whether or not a solid waste is designated as a dangerous waste a person must:
>
> (i) First, determine if the waste is a listed discarded chemical product, WAC 173-303-081;
>
> (ii) Second, determine if the waste is a listed dangerous waste source, WAC 173-303-082;
>
> (iii) Third, if the waste is not listed in WAC 173-303-081 or 173-303-082, or for the purposes of compliance with the federal land disposal restrictions as adopted by reference in WAC 173-303-140, determine if the waste exhibits any dangerous waste characteristics, WAC 173-303-090; and
>
> (iv) Fourth, if the waste is not listed in WAC 173-303-081 or 173-303-082, and does not exhibit a characteristic in WAC 173-303-090, determine if the waste meets any dangerous waste criteria, WAC 173-303-100.

The regulations then direct the generator to

check each section [of WAC 173-303-070(3)(a)], in the order set forth, until [it] determine[s] whether the waste is designated as a dangerous waste. Once the waste is determined to be a dangerous waste, further designation is not required except as required by subsection (4) or (5) of this section. If a person has checked the waste against each section and the waste is not designated, then the waste is not subject to the requirements of chapter 173-303 WAC.

WAC 173-303-070(3)(b).

■ ¶39 There are two methods by which a generator of solid waste can determine whether the solid waste is "dangerous":

For the purpose of determining if a solid waste is a dangerous waste as identified in WAC 173-303-080 through 173-303-100, a person must either:

(i) Test the waste according to the methods, or an approved equivalent method, set forth in WAC 173-303-110; or

(ii) Apply knowledge of the waste in light of the materials or the process used, when:

(A) Such knowledge can be demonstrated to be sufficient for determining whether or not it designated and/or designated properly; and

(B) All data and records supporting this determination in accordance with WAC 173-303-210(3) are retained on-site.

WAC 173-303-070(3)(c). The second option, known as " '[p]rocess knowledge[,]' is a substitute for physical testing that may be gleaned from data and records produced at some point when there was reliable knowledge as to the contents of the waste (e.g., when the waste was created, transported, buried, etc.)." *United States v. Hoffman*, 154 Wn.2d 730, 747 n.6, 116 P.3d 999 (2005). Thus, the dangerous waste regulations require the generator of solid waste to complete the four-step process set forth in WAC 173-303--070(3)(a) by either (1) using a testing method provided for in the regulations or (2) applying process knowledge. WAC 173-303-070(3)(c).

## C. Designation of Rinse Water as Dangerous Waste

 ¶40 Despite agreeing to designate all of its rinse water as dangerous waste, KP McNamara now argues that the agreement was "no more than a best management practice, or an additional protective measure to address concerns that . . . Williams had about variability of toxicity of the rinse water." Br. of Appellants at 35-36 (internal quotation marks omitted). But KP McNamara's two different agreements with the Department regarding designation of the rinse water indicate that such designation fell squarely within the scope of the designation methods set forth in WAC 173-303-070(3)(c).

¶41 KP McNamara agreed in the Department's policies and practices document that it would test each batch of rinse water, which testing the Department stated "would effectively meet the designation requirements of WAC 173-303-070(3)." CP at 678-79. Thus, KP McNamara first agreed to test the water under the first option under WAC 173-303-070(3)(c). But due to KP McNamara's concern over the high cost of batch testing, the Department and KP McNamara agreed that KP McNamara could instead "designate all waste in the 2500-gallon water storage tanks as dangerous waste." CP at 715. KP McNamara then agreed to use process knowledge to test the water under the second option under WAC 173-303-070(3)(c). Accordingly, we hold that KP McNamara's contention that it was merely engaging in a best management practice is without merit.

¶42 But KP McNamara argues that without more, the fact that it agreed to designate its rinse water as dangerous waste is insufficient to bring its conduct within the dangerous waste regulations because neither it nor the Department followed the procedures in WAC 173-303-070(3)(a)-(b) to actually determine whether the rinse water was a dangerous waste. The Department responds, and we agree, that generators of solid waste have a duty to determine whether their wastes are regulated by the HWMA. *Hickle,*

148 Wn.2d at 920. Thus, we hold that by designating its rinse water as dangerous waste, KP McNamara followed the procedures in the dangerous waste regulations and the Department was not then required to affirmatively prove that the rinse water in question was a dangerous waste.

¶43 KP McNamara relies on *Hickle* to support its contention that "what matters is whether the waste meets any criteria of a dangerous waste, not whether the waste was 'designated as' dangerous waste by the generator or [the Department]." Br. of Appellants at 34 (internal quotation marks omitted). In *Hickle*, the defendant fruit companies disposed of fruit pulp in a manner that caused it to spontaneously ignite, and the plaintiff sued the fruit companies for severe burns he suffered as a result of the burning pulp. 148 Wn.2d at 914, 916, 918. The fruit companies argued that they did not have a duty to dispose of the waste in accordance with the HWMA because the Department did not specifically designate fruit pulp as dangerous waste. *Hickle*, 148 Wn.2d at 919. The court held that because the plaintiff introduced unrebutted testimony that fruit pulp can spontaneously combust and because "ignitability" was a dangerous waste characteristic, the fruit companies' waste met the regulatory definition of "dangerous waste." *Hickle*, 148 Wn.2d at 921-22.

¶44 KP McNamara claims that the *Hickle* court remanded to the trial court to determine "whether the waste actually exhibited the characteristic of ignitability," and thus, it argues that a substance cannot be deemed a dangerous waste until there is a factual determination under the dangerous waste regulations that the material falls within one of the definitions. Br. of Appellants at 35. But KP McNamara mischaracterizes the *Hickle* holding.

¶45 The *Hickle* court did not remand for the purpose of determining whether the fruit pulp was a dangerous waste; rather, it remanded to the trial court to determine whether the fruit companies' disposal practices violated the HWMA and whether the violations caused the plaintiff's injuries.

148 Wn.2d at 923-24. Accordingly, because KP McNamara fails to establish that our Supreme Court's holding in *Hickle* bears on the present case, we hold that his contention is without merit. Moreover, *Hickle* clearly states that generators of solid waste have a duty to determine whether the waste is regulated by the HWMA under the series of regulations set forth above. 148 Wn.2d at 919. *Hickle* does not support KP McNamara's argument.

¶46 KP McNamara also contends that the Department's position and the position the Board adopted produce "absurd" results, citing *WHW, Inc. v. Department of Ecology*, No. 05-142, 2006 WL 880089, 2006 WA ENV LEXIS 13 (Wash. Pollution Control Hearings Bd. Mar. 30, 2006) as illustrative. Br. of Appellants at 32. In *WHW*, a truck driver dumped 17,000 pounds of soda ash along the side of a road and, following the spill, the Department conducted a field test of the waste that revealed that it was a dangerous waste. 2006 WL 880089, at *1-2, 2006 WA ENV LEXIS 13, at *3-5. The company responsible for the soda ash later cleaned the spill and tested the material, which testing revealed that the substance was no longer within the dangerous waste parameters for toxicity. *WHW*, 2006 WL 880089, at *2, 2006 WA ENV LEXIS 13, at *6-7. The Board concluded that the generator of the waste had the responsibility to designate the waste as dangerous at the time it spilled and the Department's testing at the time of the spill did not preclude it from assessing a penalty against the generator despite later testing showing that it was no longer toxic. *WHW*, 2006 WL 880089, at *4-5, 2006 WA ENV LEXIS 13, at *11-15.

¶47 KP McNamara appears to argue that the result in *WHW* was absurd because both the Department and the company that spilled the soda ash prevailed on summary judgment regarding whether the waste was toxic. But the disparities in the testing resulted from the fact that the Department tested the soda ash initially because the generator of the waste did not clean or test the waste for days

following the spill and when the generator later tested the soda ash, it was no longer dangerous and could be disposed of as nontoxic. *WHW*, 2006 WL 880089, at *2, 2006 WA ENV LEXIS 13, at *4-7.

¶48 Here, we hold that KP McNamara has failed to show how the result in *WHW* was absurd or that it bears on the present case. Moreover, *WHW* demonstrates that once a waste is determined to be dangerous waste, the burden is on the generator of the waste to prove otherwise. 2006 WL 880089, at *5, 2006 WA ENV LEXIS 13, at *14-15. If KP McNamara sought to change its designation of the particular rinse water in question, it had an affirmative duty to produce evidence showing that the rinse water was not a dangerous waste.

## D. No Issue of Material Fact

¶49 KP McNamara argues that it produced evidence at summary judgment raising a genuine issue of material fact about whether the rinse water it shipped to Pacific Power Vac was a dangerous waste. It relies on Kerry McNamara's declaration attached to its response to the Department's summary judgment motion, which declaration provided:

4. The rinsewater generated by KP [McNamara] is not dangerous waste. KP [McNamara] tested its rinse-water for toxicity as recently as February 6, 2006 and January 17, 2007, and each time there was no mortality in the test (i.e., the rinse-water did not designate as dangerous waste.) Attached hereto are true copies of those test results (without appendices).

5. The two 2500[-]gallon poly-tanks used to store rinse-water, by the time they are emptied, receive a mixture of clean water, soap, and residues from many different totes. While the toxicity of residues in totes is variable, the toxicity characteristic of the rinse-water is not variable because the two 2500-gallon rinse-water storage tanks always contain rinsate from many different totes and because container residues always amount to less than ten percent of the rinse-water shipped off-site.

130

6. The KP [McNamara] wash system recycles wash-water from the interiors of empty containers and stores this "dirty" rinse-water in a 500[-]gallon tank located at the head of the process. When this "dirty" rinse-water becomes too dirty to re-use it is drained to two 2500[-]gallon poly-tanks.

7. "Clean" rinse-water from the second interior rinse (if needed) and from the exteriors of containers is sent directly to the same two 2500[-]gallon poly-tanks.

8. When the two 2500[-]gallon poly-tanks are full the combined rinse-water (consisting of at most 10% "dirty" rinse-water, perhaps half of that being residue) is shipped off-site. The rinse-water never contains more than ten percent "dirty" rinse-water, thereby buffering any variability in the toxicity of container residues in the rinse-water.

CP at 844.

¶50 This affidavit indicates that the only affirmative testing of the rinse water took place in February 2006 and January 2007, which testing showed that the rinse water was not a dangerous waste. But KP McNamara did not ship the rinse water to Pacific Power Vac until 2008. Thus, the negative test results on which KP McNamara relies have no bearing on the rinse water at issue here.

¶51 Kerry McNamara also alleges in the declaration that due to the process used to rinse the totes, the rinse water in the containers was immune from variability and, thus, was not a dangerous waste. But KP McNamara agreed to designate all rinse water in the 2,500-gallon tanks as dangerous waste in its policies and practices document in order to account for the variability in rinse water due to the caustic solution used to clean the totes. It did this in lieu of testing each batch of rinse water under the dangerous waste regulations. KP McNamara now seeks to rely on the process used at the facility to argue that the rinse water was *not* a dangerous waste, when it previously relied on that process to determine that the rinse water *was* a dangerous waste when it sought to reduce the costs of testing each batch of rinse water.

¶52 We hold that KP McNamara's attempt to use the methods in the dangerous waste regulations to designate its waste differently once it became subject to the Department's penalty does not change its initial designation of the rinse water as dangerous waste, absent relevant test results to the contrary. Thus, we affirm the Board's ruling that KP McNamara's designation of its rinse water as dangerous waste using process knowledge was dispositive on whether the rinse water it shipped to Pacific Power Vac was a dangerous waste.[11] This being the case, we hold that KP McNamara failed to carry its burden to show that the waste was not hazardous.[12]

III. RECEIPT OF NON-EMPTY TOTES

¶53 In the Department's cross appeal, it argues that the Board's ruling on issue 5 should be affirmed because it did not commit a procedural error by considering the facts relevant to KP McNamara's receipt and management of non-empty totes and by failing to address the legal issues raised in issue 5. It also argues that even if there were a procedural error, KP McNamara was not prejudiced by the error. Thus, the Department argues that the Board need not reconsider the issue, contrary to the superior court's order. We hold that the Board did address the legal issue KP McNamara argued regarding issue 5 and that even if the Board had committed a procedural error, KP McNamara was not prejudiced.

A. Procedural Error

¶54 The Department contends that contrary to the superior court's ruling, the Board did not engage in an

---

[11] KP McNamara also assigns error to the superior court's ruling affirming the Board's decision. But because this case is governed by the APA, we review the Board's decision directly, and we decline to address KP McNamara's claim. *Skagit Hill Recycling*, 162 Wn. App. at 317-18.

[12] The Department does not raise waiver or estoppel as a defense to KP McNamara's argument that the Department had to prove that the waste was hazardous before it could impose a penalty. While those defenses may apply in this or similar circumstances, we do not address their application in this instance.

unlawful procedure when it considered facts relating to KP McNamara's management of non-empty totes. Because this issue involves an alleged unlawful procedure under the APA, we review the Board's actions de novo. *Loon Lake Prop. Owners*, 146 Wn. App. at 129.

¶55 The Board is a quasi-judicial body that provides uniform and independent review of the Department's actions. *Port of Seattle*, 151 Wn.2d at 592. It "has the implied authority to do everything lawful and necessary to provide for the expeditious and efficient disposition of [Department] appeals." *Motley-Motley, Inc. v. Pollution Control Hearings Bd.*, 127 Wn. App. 62, 74, 110 P.3d 812 (2005). The Board has promulgated rules of practice under chapter 371-08 WAC that permit the parties to engage in a prehearing conference at which issues for trial are determined:

> (1) The [B]oard may, upon written request by a party or on its own, schedule a prehearing conference . . . . [T]he presiding officer may schedule all deadlines for motions and discovery and memorialize those dates in a prehearing order. The prehearing order may also identify the issues to be tried, stipulations, admissions, witnesses and exhibits for the hearing.
>
> (2) The issues [that] the prehearing order identifies for the hearing shall control the subsequent course of the appeal, and shall be the only issues to be tried at the hearing, unless modified for good cause by subsequent order of the [B]oard or the presiding officer.

WAC 371-08-435.

¶56 Here, the parties' prehearing conference resulted in a statement of issues that the Board would decide. Issue 5 addressed KP McNamara's receipt of non-empty totes:

> 5. Is [KP McNamara] required to obtain a permit or to comply with the requirements for operating a dangerous waste treatment, storage and disposal [TSD] facility if [KP McNamara] receives from off-site generators containers [that] are not "empty" pursuant to [former] WAC 173-

-30[3]-160 and/or 40 CFR 261.7(b)(1) and [that] contain dangerous waste if the container[s] w[ere] shipped [to KP McNamara] without a hazardous (dangerous) waste manifest and [their] contents were [not] designated a "dangerous waste" by the generator [that shipped them to KP McNamara]?

CP at 297. Both parties agree that issue 5 was a legal issue.

¶57 KP McNamara argues that the Board's failure to expressly state a conclusion in terms of issue 5 constituted a procedural error because it improperly "substituted issues relating to KP [McNamara]'s management of non-RCRA empty totes" for the purely legal issue in issue 5. Reply Br. of Appellants/Cross Resp'ts at 38-39 (internal quotation marks omitted). It contends that doing so was contrary to the requirement set forth in WAC 371-08-435(2) that the issues in the prehearing order must be the only ones tried at the hearing unless " 'modified for good cause by subsequent order of the [B]oard or the presiding officer.' " Reply Br. of Appellants/Cross Resp'ts at 38 (quoting WAC 371-08--435(2)). But as the Board recognized and its opinion shows, the facts of the violations in this case were dispositive regardless of how the legal issue was framed or recited.

¶58 Non-empty containers are governed by the dangerous waste regulations, and facilities managing non-empty containers must have a TSD facility permit, which KP McNamara did not have. WAC 173-303-160(3)(b). Issue 5 asked the Board to determine whether, as a matter of law, KP McNamara violated the dangerous waste regulations by receiving non-empty totes when it did not have a TSD facility permit.

¶59 The parties disputed whether KP McNamara was protected by the manifest discrepancies regulations, and thus, the legal determination in issue 5 hinged on the applicability of those rules to KP McNamara at the time the alleged violations occurred. The manifest discrepancies regulations in former WAC 173-303-370(1) (2005) applied to "owners and operators who receive[d] dangerous waste

from off-site sources" and who discovered manifest discrepancies in the shipments. "Manifest discrepancies" were defined as "significant discrepancies between the quantity or type of dangerous waste designated on the manifest or shipping paper and the quantity or type of dangerous waste a facility actually receives." Former WAC 173-303-370(4)(a). The regulations allowed an owner of a facility to decline to accept a dangerous waste shipment if it was not capable of properly managing the waste in the shipment and, instead, allowed the owner to send the shipment to an alternate facility. Former WAC 173-303-370(5)(b).

¶60 KP McNamara argued that this provision implied that "taking temporary custody of the waste did not require a permit" and, thus, protected it from the Department's penalty for its receipt of the non-empty totes. 27 AR at 3 n.1. It further argued that Washington's manifest discrepancies regulations were amended in 2009 to mirror the federal manifest discrepancies rules and now allow the facility receiving a shipment with a manifest discrepancy to provide for "secure, temporary custody of the waste" pending shipment to an authorized facility. 27 AR at 3 n.2 (internal quotation marks omitted) (citing WAC 173-303-370(5)(d)(ii); 40 C.F.R. § 264.72(d)(2)); *see* Wash. St. Reg. 09-14-105 (effective July 31, 2009). KP McNamara argues that the Board was required to determine the applicability of these regulations to its mere receipt of the totes as set forth in issue 5, which determination the Board failed to make.

¶61 The facts pertaining to KP McNamara's management of the non-empty totes were properly before the Board. The notice of penalty that was the basis of issue 6 cited KP McNamara for

**[WAC] 173-303-280 and -400: Failure to obtain a permit or to comply with the requirements for operating a dangerous waste treatment, storage and disposal [TSD] facility.** KP [McNamara] accepted totes from off-site generators. These totes were not "empty" as defined in [former] WAC 173-303-

-160(2), and contained significant amounts of ignitable, extremely hazardous and toxic dangerous waste. KP [McNamara] operated as an unpermitted dangerous waste treatment, storage and disposal facility when it accepted the totes containing dangerous waste.

CP at 265. KP McNamara's contention that "[o]nly issue number 5 and issue number 3 (concerning the shipment of rinse-water off-site) [we]re related to [the Department's] penalty assessment" fails to recognize that issue 6 also clearly derived from the Department's imposition of the penalty because the Board had to determine if the alleged actions subjecting KP McNamara to penalties occurred and, if so, whether those actions amounted to a violation. Reply Br. of Appellants/Cross Resp'ts at 29; Reply Br. of Resp't/ Cross Appellant at 4-5.

¶62 The facts relevant to the violation and penalty in issue 6 encompassed more than KP McNamara's mere "receipt" of the totes as stated in the parties' issue 5. When Williams inspected the KP McNamara facility in 2007 and 2008, she discovered containers whose contents were not properly labeled and totes that contained too much material to be treated as "empty" under former WAC 173-303--160(2). CP at 796. She observed non-empty totes outside the KP McNamara building, some of which did not have lids and were "off-gassing to the air," and others that were "leaking and draining to the tote below or to the gravel." CP at 796.

¶63 Following these inspections, to satisfy the Department's concerns about the non-empty totes at the KP McNamara facility, Kerry McNamara signed the Department's policies and practices document, agreeing that

KP McNamara will not operate as a dangerous waste treatment, storage or disposal facility. The Company will not accept totes (or other containers) with residue that would designate as RCRA-regulated waste, UNLESS the container is "empty" as defined in [former] WAC 173-303-160.

. . . .

Totes (or other containers) that are not "RCRA empty" according to [former] WAC 173-303-160 will not be off-loaded at KP McNamara in Vancouver. They will not be accumulated at the site for any period of time. These containers will be shipped directly back to the generating facility.

CP at 716.

¶64 In October 2008, Williams returned to further inspect the McNamara facility and discovered that nearly 100 totes of dangerous waste wash water had accumulated onsite as well as several totes that did not meet the regulatory definition of "empty." Williams subsequently sent an immediate action letter to KP McNamara, notifying it that it violated WAC 173-303-950[13] by accepting non-empty totes because it acted as an unpermitted treatment, storage, and disposal facility. In response, Kerry McNamara wrote to Williams, stating that the facility would no longer accept totes that were not empty. He signed the letter as CEO of KP McNamara Company.

¶65 Here, KP McNamara's claim of procedural error fails to acknowledge that the Board had to evaluate KP McNamara's management of the totes to answer the question posed in issue 6, i.e., whether KP McNamara violated the hazardous waste statute and regulations when it accepted totes containing dangerous waste without being formally permitted by the Department to do so. Issues 5 and 6 were inextricably intertwined as they addressed whether a permit was required to (1) receive and manage non-empty totes containing dangerous waste not so identified in the shipping manifest and (2) manage non-empty totes containing dangerous waste. Although the parties stated the issues separately, the Board recognized that the two issues required it to answer the question of whether KP McNamara's receipt and management of non-empty totes

---

[13] WAC 173-303-950(2) provides, "Any violation of this chapter may be subject to the enforcement and penalty sanctions of chapter 70.105 RCW. Such violations include, but are not limited to . . . [t]ransferring, treating, storing, or disposing of dangerous waste without a permit."

containing hazardous wastes required a permit it did not have.

¶66 After hearing all the evidence, the Board found that "KP McNamara continued receiving more than an incidental or occasional number of non-RCRA empty totes after being directed by [the Department] to cease doing so" and that "KP McNamara repeatedly failed to follow its own standard operating procedures directing that it would not receive and manage non[-]empty totes." CP at 292.

¶67 The Board concluded that KP McNamara was subject to the TSD facility requirements under WAC 173--303-280 and WAC 173-303-400, as set forth in the notice of penalty. This conclusion answered issue 5 and issue 6 together when it determined that "KP McNamara was reasonably subjected to the requirements of WAC 173-303--280(1) and -400," which the notice of penalty identified. CP at 292.

¶68 With regard to KP McNamara's legal argument about issue 5 that it was shielded from the requirement for a proper permit by the manifest discrepancy rules, the Board concluded:

> Regardless of whether the manifest discrepancy rules are directly applicable to the KP McNamara facility, we conclude they do not operate to shield KP McNamara from a penalty . . . because KP McNamara failed to demonstrate that the manner in which it responded to receipt of the non-empty totes complied with the manifest discrepancy regulations (either the former or current versions).

CP at 291. In doing so, the Board did not err procedurally by failing to consider the legal issue presented by issue 5. It ruled that the manifest discrepancy rules, under the facts of this case, did not shield KP McNamara from the consequences of accepting hazardous wastes that were not identified in the shipping manifest. The Board's ruling constitutes a legal conclusion.

## B. No Prejudice

¶69 The Department also argues that even if the Board erred procedurally in its ruling on issue 5, KP McNamara was not prejudiced because it "had notice that the facts were to be litigated at hearing and a full opportunity to present evidence on the material facts at issue." Br. of Resp't/Cross Appellant at 40-41. We agree.

¶70 "In reviewing an agency action for procedural error, '[t]he court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of.'" *Alpha Kappa Lambda Fraternity*, 152 Wn. App. at 414 (alteration in original) (quoting RCW 34.05.570(1)(d)). "'Due process requires that the Board base its findings against a party only upon matters brought to the party's attention in the complaint or during the administrative hearing, and that are fully litigated.'" *City of Marysville v. Puget Sound Air Pollution Control Agency*, 104 Wn.2d 115, 120, 702 P.2d 469 (1985) (internal quotation marks omitted) (quoting 3 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 14.11, at 48 (2d ed. 1980)).

¶71 The Department first argues that KP McNamara was not prejudiced because "the record demonstrates that the factual issues associated with the violations were encapsulated in the issues identified for hearing from the outset of the case." Br. of Resp't/Cross Appellant at 41. As discussed above, issue 5 was not the only issue pertaining to KP McNamara's receipt of non-empty totes. Issue 6 required the court to consider facts relevant to a determination of whether KP McNamara was subject to the requirements for a TSD facility when it accepted non-empty totes. Thus, because the Board had to consider the facts KP McNamara alleges were improper in making its determination on issue 6, KP McNamara was not prejudiced by their introduction even if, as alleged, they should not have been considered to evaluate issue 5.

¶72 The Department next argues that KP McNamara was not prejudiced because KP McNamara had notice that facts pertaining to its receipt and management of non-empty totes would be before the Board because it introduced those facts at various points during the proceedings. In opposition to the Department's motion for summary judgment on issue 5, KP McNamara introduced facts about its management of non-empty totes. It argued, "The Board must understand that KP [McNamara] does not control what generators ship to it" and "for a myriad of reasons non-conforming shipments arrive at [the KP McNamara facility] from time to time." CP at 344. It continued:

> KP [McNamara] followed a protocol of inspecting every tote received at the facility. If a tote was not "RCRA empty" and if it was known or suspected to contain residues of dangerous or hazardous waste it was set aside to either be returned to the generator or forwarded under a new manifest prepared by KP [McNamara] to an authorized off-site TSD facility.

CP at 344-45. KP McNamara argued that it did not operate as an unpermitted TSD facility "when it off-loaded and stored totes containing residue of dangerous and hazardous waste at its facility" and argued that its "management practice" fell within the scope of Washington law. CP at 346.

¶73 KP McNamara acknowledged that the factual issues surrounding its management of non-empty totes would come before the Board in its motion for reconsideration. Although it argued that the Board should determine as a matter of law that KP McNamara's mere receipt of non-empty totes was not a violation of Washington law, it alternatively argued, "If the Board decides that KP [McNamara]'s management of the non-'RCRA-empty' totes is at issue, then there is a question of fact in this regard that cannot be decided on summary judgment." CP at 356.

¶74 The Board notified the parties in its order on KP McNamara's motion for reconsideration that "material facts are in dispute regarding the nature and extent of [KP McNamara]'s receipt of non-RCRA-empty containers from

off-site generators." CP at 315. Finally, at the hearing, KP McNamara presented testimony about its receipt and management of non-empty totes. On direct examination, when asked, "[W]hat do you do with those heavy containers when they would arrive at the Vancouver facility?" Kerry McNamara responded:

> We would isolate those containers. The operator there would contact me, and in some cases, you know, we would determine what the product was there. We'd contact the emptier. . . . And we would figure out how to either get it back to them or we'd bring it in to process it, depending on the product.

AR Report of Proceedings at 393. Clearly, KP McNamara was not prejudiced by the Board's consideration of facts relating to its receipt and management of non-empty totes because it had notice that the facts would be before the Board and at the hearing it assisted in fully developing those facts. Thus, we affirm the Board's procedures and by doing so reverse the superior court's remand to the Board on issue 5.

IV. Kerry McNamara's Personal Liability

¶75 Kerry McNamara individually argues that the Board improperly determined that he was personally liable for the violations in the notice of penalty imposing civil liability for violations of the HWMA and under the responsible corporate officer doctrine. He also argues that the Board should not have granted summary judgment to the Department because he raised a genuine issue of material fact in his declaration explaining why the violations occurred. We disagree.

A. Statutory Liability

¶76 Kerry McNamara first argues that the Board improperly applied the HWMA statute imposing civil liability for violations of the act. The HWMA provides civil penalties for violations of the statute and regulations implementing it:

**Violations—Civil penalties.** (1) Except as provided in RCW 43.05.060 through 43.05.080 and 43.05.150, every person who fails to comply with any provision of th[e HWMA] or of the rules adopted thereunder shall be subjected to a penalty in an amount of not more than ten thousand dollars per day for every such violation. Each and every such violation shall be a separate and distinct offense. In case of continuing violation, every day's continuance shall be a separate and distinct violation. Every person who, through an act of commission or omission, procures, aids, or abets in the violation shall be considered to have violated the provisions of this section and shall be subject to the penalty herein provided.

RCW 70.105.080. " 'Person' means any person, firm, association, county, public or municipal or private corporation, agency, or other entity whatsoever." RCW 70.105.010(14).

¶77 Relying on the last sentence of the statute, Kerry McNamara contends that the Board was required to determine that he "procured, aided, or abetted the allegedly wrongful conduct of KP [McNamara]." Br. of Appellants at 38. But a complete reading of the statute reveals that the portion of the statute Kerry McNamara relied on is clearly an alternative means of imposing civil liability, not the sole means. The statute allows civil liability to be imposed on *either* (1) a "person" who violates the HWMA or (2) a "person" who procures, aids, or abets another "person" in committing the violation. RCW 70.105.080(1). Kerry McNamara provides no authority, other than citation to the statute, to support his contention that the statute requires a specific finding that he aided or abetted in committing the violations in addition to a finding that he was, in fact, a person who committed the violations himself. Thus, we hold that the Board correctly concluded that "[u]nder RCW 70.105.080(1), Kerry McNamara is a 'person' liable for civil penalties for failure to comply with the hazardous waste statute and regulations." 11 AR at 12.

## B. Responsible Corporate Officer Doctrine

¶78 Kerry McNamara next contends that the Board improperly found him personally liable under the responsible corporate officer doctrine because the doctrine does not apply in the context of the HWMA. Under the responsible corporate officer doctrine, "[i]f a corporate officer participates in the wrongful conduct, or knowingly approves of the conduct, then the officer, as well as the corporation, is liable for the penalties." *Dep't of Ecology v. Lundgren*, 94 Wn. App. 236, 243, 971 P.2d 948 (1999). The Department need not establish wrongful conduct, but it must present " 'evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so.' " *Lundgren*, 94 Wn. App. at 244 (quoting *United States v. Park*, 421 U.S. 658, 673-74, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975)).

¶79 In *Lundgren*, the Department penalized a company and its owner for discharging waste into the Puget Sound in violation of Washington's water pollution control act (WPCA), chapter 90.48 RCW. 94 Wn. App. at 239. The Board concluded that Lundgren was not personally liable, but the superior court reversed. *Lundgren*, 94 Wn. App. at 240. On appeal, we held:

> Because the facts found by the [Board] establish that Lundgren controlled the facility with knowledge of the violations, he is personally liable under RCW 90.48.080 [(making it unlawful to discharge pollutants into the water)] and RCW 90.48.144 [(imposing liability for civil penalties under the WPCA).] [T]he [Board] erred as a matter of law in not holding him personally liable under the responsible corporate officer doctrine.

*Lundgren*, 94 Wn. App. at 246.

¶80 As *Lundgren* demonstrates, the responsible corporate officer doctrine has been applied in the context of environmental laws. 94 Wn. App. at 244. And federal courts have applied a similar theory to impose personal liability on corporate officers for violations of the RCRA. *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 745 (8th Cir. 1986) (Corporate officers can be held "individually liable if they were personally involved in or directly responsible for corporate acts in violation of [the] RCRA."). The existing authority supports the application of the doctrine in the context of the HWMA, and Kerry McNamara has failed to support his contention that the doctrine should not apply with further argument or citations to authority. Accordingly, we hold that it was proper for the Board to apply the responsible corporate officer doctrine to Kerry McNamara for the purpose of HWMA violations.

¶81 Kerry McNamara also contends that under *Lundgren*, the Board was required to "determine what duty was imposed on [Kerry] McNamara 'by the interaction of [his] authority and the statute' with respect to rinse water shipments." Br. of Appellants at 39 (second alteration in original) (quoting *Lundgren*, 94 Wn. App. at 244). This argument is apparently based on a misinterpretation of *Lundgren*. Kerry McNamara relies on the last sentence of the following passage:

> "[T]he Government establishes a prima facie case [under the responsible corporate officer doctrine] when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient [causal] link."

*Lundgren*, 94 Wn. App. at 244 (quoting *Park*, 421 U.S. at 673-74).

¶82 But the fully quoted passage refers to the corporate officer's ability to prevent or correct a violation of the relevant statute, here the HWMA, and states that his failure to do so is the premise on which liability is imposed under the responsible corporate officer doctrine. *Lundgren*, 94 Wn. App. at 244.

¶83 The Board determined that Kerry McNamara exercised significant control over KP McNamara's operations and "was clearly aware of and engaged in [responding to] the compliance problems at the Vancouver facility." 11 AR at 12. Thus, consistent with the requirements of the responsible corporate officer doctrine, the Board determined that Kerry McNamara knew of the violations and had the capacity to prevent or correct them.

¶84 The responsible corporate officer doctrine requires no further determination to impose personal liability, and Kerry McNamara fails to support his contention that a specific finding regarding " 'the interaction of [his] authority and the statute' " was required. Br. of Appellants at 39 (alteration in original) (quoting *Lundgren*, 94 Wn. App. at 244). We hold that the Board properly applied the responsible corporate officer doctrine to Kerry McNamara.

C. No Issue of Material Fact

¶85 Kerry McNamara also argues that he raised a genuine issue of material fact regarding his personal liability at summary judgment and, thus, that summary judgment was improper and he was entitled to an evidentiary hearing to determine his liability. We again disagree.

¶86 Kerry McNamara submitted a declaration opposing the Department's summary judgment motion in which he described the tote rinsing process at the KP McNamara facility, suggesting that the process made it impossible for the rinse water to be a dangerous waste. He also offered reasons why the shipping violations relating to issue 3 occurred. He argues that these statements raised a genuine

issue of material fact because "[t]he testimony that [Kerry] McNamara gave in his Declaration explains why the alleged transport violations occurred despite his best efforts to the contrary." Br. of Appellants at 40.

¶87 But the issue of personal liability rests not on whether the violations in the notice of penalty occurred, but whether Kerry McNamara's control and involvement in the company subjected him to personal liability under the relevant law, here RCW 70.105.080(1) and the responsible corporate officer doctrine. In its order granting the Department's summary judgment motion, the Board concluded, and we agree, that "Kerry McNamara, as President and CEO, exercised operational hands-on control and acted as the responsible corporate officer for the [KP McNamara] facility in a manner nearly identical to that analyzed by the Court of Appeals in *Lundgren*." 11 AR at 11-12.

¶88 In *Lundgren*, the court determined that based on the facts before it, Lundgren exercised sufficient "hands-on control of the facility's activities" to subject him to personal liability. 94 Wn. App. at 245. Lundgren communicated with the Department regarding conditions at the facility and expressed a willingness to comply with the Department to rectify sewage treatment problems, the Department sent Lundgren an order cancelling his permit and directing him to cease discharging pollutants into the water, and he appealed the Department's order. *Lundgren*, 94 Wn. App. at 245.

¶89 Kerry McNamara's actions parallel and surpass those of Lundgren, demonstrating his personal control and involvement with the company. Kerry McNamara personally met with the Department's inspector at the KP McNamara facility to discuss the facility's "operational plan." CP at 678. Kerry McNamara signed the Department's policies and practices statement indicating how he would bring the KP McNamara facility into compliance with the dangerous waste regulations, signing as president of KP McNamara. Kerry McNamara personally responded

to the Department's immediate action letter regarding the accumulation of non-empty totes on site in a letter stating that KP McNamara would no longer accept non-empty totes, which he signed as CEO of KP McNamara. Kerry McNamara sent a letter to the Department documenting the disposition of the non-empty totes at the facility that he signed as CEO of KP McNamara, and he signed compliance certificates as president of KP McNamara. Finally, the Department named Kerry McNamara on its notice of penalty and Kerry McNamara appealed that penalty.

¶90 Kerry McNamara argues that the evidence does not support the Board's conclusion because it "suggests that he was doing everything he could to ensure that rinse-water shipments were transported in accordance with the Dangerous Waste regulations." Br. of Appellants at 40. But Kerry McNamara's attempt to rectify the violations and his explanation for why those violations occurred indicate that Kerry McNamara had control over the facility, had knowledge of the violations, had the authority to prevent or remedy them, and failed to do so. *See Lundgren*, 94 Wn. App. at 244, 246. Accordingly, we hold that Kerry McNamara failed to raise a genuine issue of material fact as to whether he was a responsible corporate officer and we affirm the Board's conclusion that the Department was entitled to judgment as a matter of law.

V. ATTORNEY FEES

¶91 KP McNamara appeals the superior court's denial of attorney fees on the issue the court remanded to the Board, arguing that the superior court erred[14] in denying KP McNamara fees because it was the prevailing

---

[14] Although KP McNamara argues that the superior court "erred" when the court denied its request for attorney fees, we review decisions regarding attorney fees under RCW 4.84.350 for abuse of discretion. *Constr. Indus. Training Council v. Wash. State Apprenticeship & Training Council*, 96 Wn. App. 59, 66, 977 P.2d 655 (1999).

party entitled to fees under RCW 4.84.350. RCW 4.84-.350(1) provides:

> [A] court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.

¶92 In support of its contention that it was the prevailing party at superior court, KP McNamara relies on the superior court's conclusion that the Board had committed a procedural error and, thus, remanded issue 5 to the Board. But because we conclude that the Board did not commit a procedural error and we affirm the Board, KP McNamara is not entitled to attorney fees for the issue remanded by the superior court.

¶93 KP McNamara also requests attorney fees and costs on appeal under RAP 18.1 and RCW 4.84.350(1). Because KP McNamara is not the prevailing party, we deny its request for attorney fees and costs on appeal.

¶94 We affirm the Board's decision in full, reverse the superior court's remand to the Board on the issue of KP McNamara's receipt and management of non-empty totes, and deny attorney fees to KP McNamara.

QUINN-BRINTNALL and PENOYAR, JJ., concur.

Review denied at 177 Wn.2d 1023 (2013).

Reconsideration denied February 19, 2013.