**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| JOHN STAMATOYANNOPOULOS, | No. 87706-2-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| UNIVERSITY OF WASHINGTON, | |
| Respondent. | |

FELDMAN, J. — Dr. John Stamatoyannopoulos, previously a tenured professor of genome sciences and medicine at the University of Washington (the University), seeks relief under the Washington Administrative Procedure Act (APA), chapter 34.05 RCW, from the University's termination of his employment based on violations of its rules and policies regarding outside consulting work for compensation. Because Stamatoyannopoulos fails to establish any basis for relief, we affirm.

I

Stamatoyannopoulos served as a tenured professor at the University from 2005 until his termination in 2022. University faculty are subject to Executive Order 57 (EO 57), the University's "Outside Professional Work Policy," and "Grants Information Memorandum 10" (GIM 10), the University's "Financial Conflict of Interest Policy." Critical here, the University requires faculty to "obtain prospective

approval" when they wish to "engage in outside activities for compensation" by completing an approved Form 1460, which discloses information about the faculty member's involvement with an outside organization.

During his employment at the University in 2014, Stamatoyannopoulos incorporated the Institute for Translational Biosciences, later known as the Altius Institute for Biomedical Sciences (Altius), as a non-profit organization. Weeks after the incorporation, Stamatoyannopoulos met with the University to discuss his planned research at Altius. Following the meeting, the University documented the conditions with which Stamatoyannopoulos would need to comply to participate in the Altius research while employed by the University, including "disclosure of financial interests . . . and obtaining prior approval for all outside professional work." The University also recommended that Stamatoyannopoulos' proposal for outside work be reviewed according to EO 57's criteria for "involvement with commercial enterprise, deeper than consulting."

In January 2015, Stamatoyannopoulos disclosed $5,000 of compensation he received from Altius in December 2014. He later revised the amount upwards to $50,000 and then $500,000 for the same time period. In February 2015, the University requested that he complete Form 1460 describing the nature of his efforts at Altius to obtain approval before engaging in the outside work, but he did not do so. Noting concerns with Stamatoyannopoulos' compliance with its policies, the University repeatedly asked him in March and April for information about his relationship with Altius and demanded he seek approval. In May 2015, Stamatoyannopoulos belatedly submitted Form 1460, stating that he received

$60,000 from Altius between July 2014 and June 2015. The following week, Stamatoyannopoulos explained he was to be the President of Altius, which is "not a conventional institute with independent faculty, etc. Rather, it will essentially function as [a] large single laboratory that I will direct." Shortly thereafter, GlaxoSmithKline (GSK) announced the launch of Altius in a press release noting its "$95 million in cash and other resources" to fund Altius' research. The University denied Stamatoyannopoulos' request to approve outside work for compensation under EO 57.

The following month, the University reiterated its position that outside work with Altius could not be approved. Thus began a lengthy dispute regarding Stamatoyannopoulos' determination to continue working for Altius and the University's concern there was "significant overlap and intertwinement between your existing role as a full-time regular faculty member of the University of Washington and your current and proposed role with Altius as founding corporate member, board member, president, scientific director, [and] lab director of a proposed 40-80 person lab . . . ." The University continued to demand compliance with its policies while proposing alternate arrangements that would comply with University policy. Unknown to the University at the time, Altius hired Stamatoyannopoulos with an annual base salary of $750,000 per year, retroactively effective January 1, 2015. In October 2015, Stamatoyannopoulos submitted a new Form 1460 requesting approval of outside work, which was again denied.

Early the following year, the University relinquished Stamatoyannopoulos' research grants because accepting them was not compliant with federal law due to his "continued engagement in outside work for Altius," which did not comply with University policy. In March 2016, Stamatoyannopoulos' department chair e-mailed him, "several months have passed since your request to perform outside work for Altius failed to gain approval, and now your lab has been relocated to Altius. It's time you and I discussed your role at Altius and your faculty appointment in the department, so that we have clarity on moving forward." In June 2016, the Dean of the School of Medicine (the Dean) sent Stamatoyannopoulos a letter to "discuss your noncompliance with UW Executive Order (EO) 57, UW outside work and conflict of interest policies," and the subsequent meeting still did not resolve the issue.

Resolution efforts having failed, the University appointed a special investigating committee to formally investigate Stamatoyannopoulos' alleged violations of EO 57 and GIM 10. In June 2017, the committee returned its findings, which indicated Stamatoyannopoulos had violated portions of both EO 57 and GIM 10 by working for Altius prior to receiving approval, that his involvement with Altius was "deeper than consulting irrespective of the designation of this venture as a non-profit organization," thus requiring a more extensive disclosure and approval process, and that his "activities with Altius conflict with his responsibilities as a full-time University professor." In February 2018, the Dean offered Stamatoyannopoulos "one more opportunity to meet with me to see if we can reach a resolution to this matter" before initiating a formal adjudication relating to the

special investigating committee's finding that he had violated University policy. The parties did not resolve their conflict.

In April 2018, the Dean requested a formal adjudication from the Provost of the University. The Provost, in turn, initiated an adjudication to determine whether Stamatoyannopoulos should "be removed from his faculty position and dismissed from employment at the University." The University appointed a faculty adjudication chair (the Chair), and the Chair provided notice to all parties that she would be selecting a three-person hearing panel to adjudicate the matter in approximately two months. On September 17, 2018, the Chair informed the parties of the identities of three faculty members appointed to serve on the hearing panel.

The adjudication took place over ten days in 2019 and included testimony from numerous witnesses, more than 150 exhibits, and the participation of the parties and their retained counsel. Following the adjudication, the hearing panel issued its "Findings, Conclusions and Order" (the Order). The Order concluded that the "most serious remedy" of dismissal "is appropriate under these circumstances" because "[t]he strategy pursued by Stamatoyannopoulos in disregarding University policy and rules led directly to significant negative impact on students, researchers and employees who desired to continue working with and learning from Stamatoyannopoulos." Stamatoyannopoulos appealed the Order to the President of the University. The President affirmed the Order. Stamatoyannopoulos filed a petition for an immediate stay of the action to terminate his employment and for reconsideration. The President denied his

petition for a stay and reconsideration, and the University terminated his employment.

Stamatoyannopoulos then filed a petition for review in King County Superior Court. The superior court upheld the University's decision. This timely appeal followed.

II

Where, as here, a litigant seeks relief under the APA from an agency order in an adjudicative proceeding, "we 'look to the administrative record, not the superior court's findings or conclusions, when conducting judicial review of an agency decision.'" *Mariani v. Dep't of Fin. Inst.*, 34 Wn. App. 2d 361, 368, 568 P.3d 689 (2025) (quoting *Rios-Garcia v. Dep't of Soc. & Health Servs.*, 18 Wn. App. 2d 660, 667, 493 P.3d 143 (2021)). Applying the APA, "we may grant relief from an agency order for any one of nine reasons set forth in RCW 34.05.570(3)(a)-(i)." *Am. Fed'n of Teachers, Local 1950 v. Pub. Emp't Relations Comm'n*, 18 Wn. App. 2d 914, 921, 493 P.3d 1212 (2021). As the party challenging the agency action, Stamatoyannopoulos bears the burden of demonstrating the invalidity of the agency's decision. RCW 34.05.570(1)(a).

Stamatoyannopoulos argues we should grant relief under four subsections of RCW 34.05.570(3): subsection (c), which authorizes relief if "[t]he agency has engaged in unlawful procedure or decision-making process"; subsection (d), which authorizes relief if "[t]he agency has erroneously interpreted or applied the law"; subsection (e), which authorizes relief if "[t]he order is not supported by evidence

that is substantial"; and subsection (i), which authorizes relief if "[t]he order is arbitrary or capricious." We address each in turn.

A

Citing RCW 34.05.570(3)(c), Stamatoyannopoulos argues he was denied due process when the University "failed to follow its own procedures" by convening a three-person hearing panel instead of a five-person hearing panel. We disagree.

As noted, this court may grant relief from an agency order under RCW 34.05.570(3)(c) where "[t]he agency has engaged in unlawful procedure or decision-making process." We review allegations that an agency has engaged in unlawful procedure or failed to follow a prescribed procedure de novo. *K.P. McNamara Nw., Inc., v. Dep't of Ecology*, 173 Wn. App. 104, 121, 292 P.3d 812 (2013) (citing *Stevens County v. Loon Lake Prop. Owners Ass'n*, 146 Wn. App. 124, 129, 187 P.3d 846 (2008)). The University's Faculty Code Chapter 28 governs adjudicative proceedings for the resolution of disputes between the University and faculty members. Section 28-33E provides in relevant part, "adjudications shall be heard by a hearing officer and a hearing panel of three faculty members, except that upon the request of at least one of the parties, the hearing panel shall be increased to five faculty members . . . ." The policy does not contain a deadline for when such a request must be made.

As mentioned above, on June 26, 2018, the Chair sent all parties a memorandum that included the timeline for convening the adjudication. The memorandum stated in relevant part:

**Postponement of Adjudication and Appointment of the Panel**

Faculty Code Section 28-33I does not require panels to meet during the period of June 16 through September 15. Therefore, the work of this panel will commence on September 15, 2018.

In addition, under FCG 28-33E, the presumed size of the hearing panel is three members. However, any party on his own may request to enlarge the panel to five members. In addition, the Faculty Code also allows all parties to agree to waive the faculty panel and proceed with the hearing officer alone.

Given that this adjudication is paused until September 16, 2018, it seems prudent to allow the parties time to confer with counsel and each other to determine how they wish to proceed.

**Therefore, if the Faculty Adjudications Chair does not hear otherwise from the parties, she will begin the search for a three-person panel on August 15, 2018 and will appoint the panel no later than September 14, 2018.**

Stamatoyannopoulos did not request a five-person panel prior to August 15, 2018 (nor prior to September 14, 2018) despite the reminder that he may do so. On September 17, 2018, having not heard otherwise as to panel size in accordance with the above memorandum, the Chair informed the parties of the identities of three faculty members appointed to serve on the hearing panel. Eleven days after the three faculty members were identified and appointed, Stamatoyannopoulos requested that the panel be increased from three to five members. The Chair did not appoint any additional panel members. This, Stamatoyannopoulos avers, violated his due process rights.

The due process clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." Due process is a flexible concept and should be applied based on the demands of the particular situation. *Morris v. Blaker*, 118

Wn.2d 133, 144, 821 P.2d 482 (1992). At its core, it is a right to be meaningfully heard, but its minimum requirements depend on what is fair in a particular context. *In re Det. of Stout*, 159 Wn.2d 357, 370, 150 P.3d 86 (2007) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). To determine what due process requires in a particular context, we employ the *Mathews* test, which requires us to consider (1) the private interest affected, (2) the risk of erroneous deprivation of that interest through existing procedures and the probable value, if any, of additional or substitute procedural safeguards, and (3) the governmental interest, including costs and administrative burdens of additional or substitute procedural requirements. *Fields v. Dep't of Early Learning*, 193 Wn.2d 36, 45, 434 P.3d 999 (2019) (quoting *Mathews*, 424 U.S. at 335).

Before applying the *Mathews* factors, it is important to correctly identify the precise due process issue before us. Stamatoyannopoulos focuses his argument on whether a three-person hearing panel—as opposed to a five-person panel—is constitutionally deficient. This argument misses the mark because the University did not (and does not) unilaterally impose a three-person hearing panel. Rather, it presumptively imposed a three-person panel and permitted Stamatoyannopoulos to request a five-person panel so long as he did so by a prescribed deadline. Thus, the dispositive due process issue is whether the prescribed deadline for requesting a five-person panel—as opposed to a longer deadline or no deadline—is constitutionally deficient. Stamatoyannopoulos does not meaningfully address that issue.

Turning to the merits of Stamatoyannopoulos' contention that he was denied due process, application of the *Mathews* factors does not support his argument. Examining the first *Mathews* factor, the University does not dispute that Stamatoyannopoulos' employment as a tenured professor is a legitimate private interest. *Wash. Educ. Ass'n v. State,* 97 Wn.2d 899, 908, 652 P.2d 1347 (1982). As to the second *Mathews* factor, there is no significant risk that a person's interest will be erroneously deprived if they are given written notice of the adjudication deadlines, including the deadline for requesting a five-person panel and the date of the hearing, participate in that hearing while represented by counsel, and are afforded the opportunity to call witnesses, as Stamatoyannopoulos did here. *Cf. In re Det. of Ross*, 30 Wn. App. 2d 930, 945, 547 P.3d 278 (2024) (finding no due process violation despite "singular decision-maker" based on attendant procedural safeguards). As to the third factor, there is a strong agency interest in having parties comply with reasonable written deadlines provided with sufficient notice, particularly given the risk (present here) that a litigant will request a larger hearing panel only if they are dissatisfied with the disclosed panel members. That interest outweighs Stamatoyannopoulos' interest in receiving a larger panel after the lengthy period to request one had lapsed. Thus, while the first *Mathews* factor weighs in favor of Stamatoyannopoulos, the second and third factors are fatal to his argument. On this record, there was no due process violation.

Stamatoyannopoulos' argument to the contrary is unavailing. He contends that "The Panel's decision violated [Faculty Code] 28-33(E), which provides that upon request of any party, the panel shall be increased to five faculty members."

But the University is not required under procedural due process principles to accommodate such a request forever—without regard to reasonably imposed deadlines. Here, Stamatoyannopoulos was afforded several weeks to request a five-person panel. Courts have rejected due process challenges to significantly shorter deadlines. *See, e.g., Payne v. Mount*, 41 Wn. App. 627, 635, 705 P.2d 297 (termination letter citing statute containing applicable ten-day deadline for appeals to the civil service commission satisfied due process requirements); *Wash. Educ. Ass'n*, 97 Wn.2d at 908-11 (rejecting procedural due process claim to bill that required dismissed faculty members to request a hearing within ten days). Indeed, Stamatoyannopoulos does not argue—nor could he—that the several weeks' notice he received to request a larger panel size was constitutionally deficient. On this record, the University did not violate due process by establishing a reasonable deadline to request a five-person panel and failing to increase the panel size based on Stamatoyannopoulos' untimely request, particularly given the deference we accord agencies in administering their own policies. *See Port of Seattle v. Pollution Control Hrgs. Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004).

Stamatoyannopoulos also argues he was prejudiced by the decision of a three-person panel rather than a five-person panel. But his argument misses the point; while Stamatoyannopoulos claims the four-to-one majority required to terminate his employment with a five-person panel would have been advantageous in comparison to the two-to-one majority applied here, the issue on appeal is whether the adjudicative process violated due process. Here, the University's process appropriately guarded against the erroneous deprivation of

Stamatoyannopoulos' interest by affording both notice of the deadline for requesting a five-person panel and the opportunity to be heard on all issues relating to the University's termination decision. Accordingly, we reject Stamatoyannopoulos' argument that the hearing panel engaged in an unlawful procedure or decision-making process.

B

Relying on RCW 34.05.570(3)(d), Stamatoyannopoulos argues the hearing panel's conclusion that he did not comply with EO 57 was an error of law. RCW 34.05.570(3)(d) allows for relief from an agency order when "[t]he agency has erroneously interpreted or applied the law." Applying de novo review, *Mariani,* 34 Wn. App. 2d at 368, we reject this argument.

As noted above, EO 57 governs outside consulting work for compensation. It was adopted in accordance with Washington's Ethics in Public Service Act (the Act), chapter 42.52 RCW, which provides:

> Consistent with the state policy to encourage basic and applied scientific research by the state's research universities . . . and consistent with the expectations of university faculty to produce, publish, and disseminate research and scholarship, each university . . . may develop, adopt, and implement one or more written administrative processes that *shall apply in place* of the obligations imposed on institutions of higher education, faculty, and university research employees under [the Act].

RCW 42.52.220(1) (emphasis added). Because EO 57 was adopted pursuant to RCW 42.52.220(1) and approved by the Governor, it applies in place of the Act as the applicable policy here.

EO 57 states, "The first obligation of members of the faculty and staff is the preparation for and carrying out of official University duties. Full-time faculty and

staff are expected to devote full-time effort . . . to their institutional responsibilities."

The policy thus establishes rules for faculty members seeking to "engage in outside consulting activities for remuneration." Relevant here, the policy states, "[o]utside consulting work for compensation must be approved in advance." As the hearing panel correctly noted, "Stamatoyannopoulos was required to obtain approval for the outside work. This never happened."

As Stamatoyannopoulos observes, EO 57 also recognizes some exceptions to the policy which are "not considered outside consulting and prior approval is not required." The policy provides:

> Members of the University faculty . . . are encouraged to participate in the work of nonprofit professional associations and societies, to contribute their expertise to scholarly, editorial, and advisory bodies including governmental bodies related to their academic work, and to serve on public commissions or boards of philanthropic organizations. These involvements are most appropriately characterized as University and community service and are complementary to University responsibilities. Such activities are not considered outside consulting and prior approval is not required.

It continues, "Faculty members . . . are also encouraged to accept invitations by nonprofit organizations, colleges and universities, and governmental agencies for purposes of presenting guest lectures, delivering papers, serving on review panels, and participating in accreditation activities."

In contrast to the exceptions noted above that do not require approval, EO 57 includes a section that sets forth rules for "Involvement with Commercial Enterprise, Deeper than Consulting." That section provides, "The likelihood of such involvement has increased as the potential to develop commercial enterprises to market university research-based technology has increased." It also

states, "Involvement with commercial enterprise also offers the potential for conflicts of interest and commitment . . . and for interference with the employee's primary allegiance to the University and its teaching, research, and public service missions."

It then continues:

[E]ssential elements of the University's commitment to encouraging appropriate technology transfer are the protection of the University's integrity and primary goals of education and open inquiry, and the management of potential conflicts of interest. Careful attention to avoiding such conflicts ultimately serves the interests of both the employee and the University. Toward this end, this section prescribes a disclosure and approval process for involvements with commercial enterprise deeper than usual professional affiliations or outside consulting. The policy recognizes the need for flexibility and the difficulty of anticipating all situations that may arise by leaving discretion to an employee's supervisor to interpret the policy and evaluate the activity proposed in the context of the unit in question.

The policy further states, "the University has the responsibility to evaluate carefully the benefits and costs of its employee's deeper involvement with commercial enterprise. All employees[] must disclose to their supervisors involvements with such enterprise where there is potential for conflict of interest, commitment, or allegiance with their University position."

Especially relevant here, the policy also provides:

The following activities trigger a more in-depth review:

a)  Extensive consulting with a for-profit business venture, with a start-up company, with a company in a developmental phase, or with prospective investors in any of these;
. . . .

c)  Holding of a line management position in a commercial enterprise;

> d)      Participation in the day-to-day operations of a commercial enterprise; or
>
> e)      Assumption of a key, continuing role in the scientific and technical effort of a commercial enterprise.

Thus, while some activities do not require University approval, certain activities—those that involve extensive involvement or participation in a commercial enterprise—must be approved by the University following an in-depth review.

Applying EO 57 here, the hearing panel concluded:

> There is no question that Stamatoyannopoulos had deeper than consulting involvement with the ITB/Altius entities.  He became the principal person responsible for Altius' activities as President, Scientific Director and board member with half the board votes.  As a result, Stamatoyannopoulos was required to obtain approval for the outside work.  This never happened.

This conclusion, Stamatoyannopoulos avers, erroneously interprets or applies EO 57 and therefore entitles him to relief under RCW 34.05.570(3)(d).

Contrary to Stamatoyannopoulos' argument, the hearing panel did not erroneously interpret or apply EO 57.  It is undisputed that Stamatoyannopoulos was engaged in outside work as the President of a research laboratory without approval from the University.  His extensive involvement overseeing Altius presented a clear time commitment challenge in conflict with his responsibilities as a full-time professor at the University.  Potential for a serious conflict of interest was present due to the depth of his relationship with Altius concurrent with his role as a faculty member of the University.  As the hearing panel concluded, "As a faculty member whose 'first obligation' was to carry out his official University duties, Stamatoyannopoulos was required to obtain approval for this outside work."  Because Stamatoyannopoulos failed to obtain such approval, the hearing panel

did not err in concluding his "intentional failure" to do so was "manifest neglect of a faculty member's duty."

Moreover, Stamatoyannopoulos' work was different from the exceptions to EO 57, wherein faculty "participate in the work of nonprofit professional associations and societies," "contribute their expertise to scholarly, editorial, and advisory bodies," and "serve on public commissions or boards of philanthropic organizations." Unlike those professional, scholarly, public, or philanthropic organizations which may be exempt from EO 57 where a faculty member's involvement is limited and not in conflict with their obligations to the University, Altius is more analogous to the commercial enterprises that pose special risk of a conflict of interest and are subject to "deeper involvement review." As Stamatoyannopoulos himself explained, "[a]lthough [Altius is] organized as a public charity, the Institute does not plan to engage in any philanthropic fundraising." His activities were similar to those that trigger a deeper involvement review because he held "a line management position" overseeing the "day-to-day operations" of Altius and assumed "a key, continuing role in the scientific and technical effort of [Altius]," as contemplated by EO 57. Accordingly, Stamatoyannopoulos has not established an entitlement to relief on this basis.

Notwithstanding the above, Stamatoyannopoulos argues the University erred by applying EO 57's "deeper involvement review" to him because it applies only to "commercial entities" whereas Altius is registered as a "non-profit." Stamatoyannopoulos misreads the University's policy. EO 57's description of the "deeper involvement review" emphasizes the purpose of the review is to scrutinize

the depth of an employee's involvement with an outside entity, not the classification of the entity itself. The deeper review applies "when the requesting member of the academic community has *an ongoing scientific, technology transfer, or deeper involvement with the organization* for whom the request is being made," just like the one Stamatoyannopoulos had with Altius. (Emphasis added.)

Despite Stamatoyannopoulos' assertion that Altius is registered as a non-profit, which he avers excuses his activity from scrutiny, his disclosures belie how different his relationship with Altius was from the kinds of activities exempt from EO 57. Altius' federal tax filings indicate Stamatoyannopoulos worked there 40 hours per week and received nearly $750,000 in compensation in 2015 alone. He described his role as "president and scientific director" of Altius while "oversee[ing] . . . 40-50 scientific personnel and a small administrative unit" for Altius. Such extensive efforts for an outside entity are not similar to the EO 57 exclusions (quoted above) for limited participation in professional, scholarly, public, and philanthropic organizations. Nor were his activities at Altius similar to another exception wherein "Faculty members . . . are also encouraged to accept invitations by nonprofit organizations, colleges and universities, and governmental agencies for purposes of presenting guest lectures, delivering papers, serving on review panels, and participating in accreditation activities."

In any event, whether Stamatoyannopoulos' direct employer is registered as a non-profit organization is not wholly dispositive. As the hearing panel explained, "The deeper involvement review required by EO 57 is not narrowly limited to direct employment by, investment in or contracting with a commercial

enterprise. Rather, the rules apply to 'deeper involvement with a commercial enterprise' where 'there is potential for conflict of interest, commitment, or allegiance with their University position.'" Here Stamatoyannopoulos' extensive involvement with GSK—a large commercial entity—poses the risk of conflict the University was entitled to review under its policy. As Stamatoyannopoulos explained, GSK "is currently the sole funder of the Institute, and there are no plans for additional corporate funders at this time." As the hearing panel noted, GSK's public announcement stated that Altius would be "'pioneering new technologies and approaches," which GSK expected to "capitalize" on. To that end, "expecting Altius to be a catalyst of innovation, GSK . . . retained first rights to option the Institute's inventions, and to invest in commercialization of its discoveries via spinout companies." Such activities are precisely the kinds of conflict the University sought to manage through EO 57 where research otherwise conducted to the University's benefit may be instead "capitalized on" by a commercial entity. Because the hearing panel did not erroneously interpret or apply the law, we reject Stamatoyannopoulos' claim for relief under RCW 34.05.570(3)(d).

C

Next, citing RCW 34.05.570(3)(e), Stamatoyannopoulos asserts the hearing panel's "direct and mixed findings on pages 3 through 9 of the Panel Decision lack substantial evidence" and that the finding as to his "neglect of duty" is not supported by substantial evidence. His argument is unavailing.

RCW 34.05.570(3)(e) allows for relief from an agency order when "[t]he order is not supported by evidence that is substantial." "The appellant must

present argument to the court why specific findings of fact are not supported by the evidence and must cite to the record to support that argument." *Inland Foundry Co., Inc. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001). A separate assignment of error for each finding of fact a party contends was improperly made must also be included with reference to the finding by number. RAP 10.3(g). "Where a party "fail[s] to provide argument addressing why . . . findings are not supported by substantial evidence," we "treat the findings as verities on appeal." *Gibson v. Dep't of Emp't Sec.*, 185 Wn. App. 42, 53, 340 P.3d 882 (2014) (citing *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993)).

Here, Stamatoyannopoulos' assignments of error indicate he will "describe[] more fully in the Statement of Facts" what the allegedly unsupported findings are, but the facts section of his brief does not contest specific factual findings by the hearing panel. The closest Stamatoyannopoulos comes to making such an argument is his assertion that "[t]here simply was no testimony from any witness that Dr. Stamatoyannopoulos' work at [Altius] adversely affected any students, the University, or interfered with his duties." But the hearing panel was not required to hear specific testimony to that effect to find the University was harmed based on the overwhelming evidence that the University lost Stamatoyannopoulos' laboratory, its research, and the attendant learning opportunities for its students as a result of Stamatoyannopoulos' extensive work for Altius. At bottom, Stamatoyannopoulos fails to establish any entitlement to relief under RCW 34.05.570(3)(e).

D

Lastly, citing RCW 34.05.570(3)(i), Stamatoyannopoulos argues the hearing panel's decision terminating his employment was arbitrary or capricious. He is not entitled to relief on these grounds.

RCW 34.05.570(3)(i) allows for relief when "[t]he order is arbitrary or capricious." Review of this issue is de novo. *Linville v. Dep't of Ret. Sys.*, 11 Wn. App. 2d 316, 327, 452 P.3d 1269 (2019). Agencies act in an arbitrary or capricious manner when their action is "willful and unreasoning and taken without regard to the attending facts or circumstances." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Port of Seattle*, 151 Wn.2d at 589. Because the record shows the hearing panel considered the "attending facts and circumstances" and its decision is not "willful and unreasoning," we reject Stamatoyannopoulos' argument that the decision is arbitrary or capricious under RCW 34.05.570(3)(i).

Stamatoyannopoulos does not argue the University acted in a manner that was unreasoning or "taken without regard to the attending facts or circumstances." He instead claims the University treated *other* professors' distinguishable requests for various approvals differently than his. Such allegations, even if true, are not sufficient to suggest the University acted arbitrarily or capriciously in reviewing the facts and circumstances of Stamatoyannopoulos' particular compliance with University policy. This argument is unavailing.

Finally, to the extent Stamatoyannopoulos claims that the hearing panel's decision was arbitrary or capricious because the University "disregarded its duty to manage any potential conflicts of interest under GIM 10," this argument is likewise unavailing. Fatal to Stamatoyannopoulos' claim, his appellate briefing does not identify with citation to the record the actions the University purportedly failed to take that are, as he contends, arbitrary or capricious. Nor does he provide decisional authority or analysis supporting a conclusion that the hearing panel's decision was arbitrary or capricious based on the University's alleged complicity. We therefore reject this claim. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

III

In sum, Stamatoyannopoulos has not established any of the asserted grounds for relief from an agency order: the hearing panel did not violate his procedural due process rights, it did not err in applying the law, its findings are verities on appeal because Stamatoyannopoulos did not establish otherwise, and it did not act arbitrarily or capriciously in deciding to terminate Stamatoyannopoulos' employment. We therefore affirm the University's final decision and, accordingly, affirm the trial court's decision on judicial review.

Feldman, J.

WE CONCUR:

Díaz, J.

, ACJ

- 21 -